**TRANSPARENT PRODUCTS CORPORATION, Plaintiff–Appellant/ Cross–Appellee,**

v.

**PAYSAVER CREDIT UNION, Defendant–Appellee/Cross–Appellant.**

**Nos. 88–1286, 88–1324.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1988.

Decided Dec. 16, 1988.

Michael D. Weis, Law Office of Michael D. Weis, Northbrook, Ill., for plaintiff-appellant/cross-appellee.

C. Jackson Darnall, Darnall, Polachek & Assoc., Franklin Park, Ill., for defendant-appellee/cross-appellant.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and GRANT, Senior District Judge.*

EASTERBROOK, Circuit Judge.

Uncertain of the difference between a line of credit and a letter of credit, the president of Paysaver Credit Union signed this document on the Credit Union's letterhead:

Transparent Products Corporation

Bensenville, IL. 60101

RE: Thomas Wells

Gentlemen:

We hereby establish our letter of credit at the request of Thomas Wells of 1003 South 23rd Avenue, Maywood and of Titan Tool of 1315 South 3rd Avenue, Maywood up to the aggregate amount of fifty-thousand dollars ($50,000).

At the time Paysaver signed this document, Titan Tool owed Transparent some $33,000 on open account credit for plastics. Titan wanted to buy another $61,000 worth, but Transparent had balked unless Titan's creditworthiness could be assured. Wells, an employee of Titan who had a $50,000 certificate of deposit with Paysaver, procured this document. Transparent apparently deemed it insufficient assurance of payment and did not sell additional goods to Titan. Some 13 months later Titan, then a debtor in bankruptcy, still had not paid the original $33,000. Transparent demand-ed that Paysaver make good the debt. Transparent believes that the document guarantees Titan's general debts; Paysaver believes that the document is a mish-mash with no legal effect.

The district court concluded after a trial (at which the president of Paysaver allowed that he did not understand how letters of credit differed from lines of credit) that the document is a letter of credit. The court then held, in part on the basis of the intent underlying Paysaver's decision to send the document, that Transparent's delay in making a demand equitably estopped it from collecting. The injection of such considerations into the enforcement of letters of credit is unprecedented and would be most unfortunate. The district court did not find that Transparent deceived Paysaver or otherwise induced detrimental reliance on an unkept promise; it found only that Transparent tarried unduly. Letters of credit are designed to provide assurance of payment and could not serve that purpose if the beneficiary risked being denied payment for withholding a ·demand "for too long" while attempting to collect from the primary debtor. We need not consider, however, whether principles of estoppel are forever beyond the pale when dealing with letters of credit, for Paysaver defends its judgment on the ground that the document is not one.[1]

Letters of credit facilitate commercial transactions by providing the assurance of a reliable party that a debt will be paid quickly and with no fuss. Letters often provide that the issuer will pay on presentation of shipping documents, relieving the seller of the risk of nonpayment (or delayed payment) while shifting to the buyer the risk that the goods will be defective and it will need to pursue the seller. Standby letters of credit do not contemplate immediate payment by the issuer but serve as assurance if the debtor does not pay. Guarantee letters of credit serve a role similar to more conventional guaran-

---

* Honorable Robert A. Grant, of the Northern District of Indiana, sitting by designation.

1. Paysaver took a cross appeal to assert this argument, an unnecessary and confusing step. *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 439 (7th Cir.1987).

tees of debt, but with the promise that the issuer will pay on demand rather than balk and precipitate litigation to determine whether the underlying debt was due (a common event when guarantees are issued by officers or shareholders of the debtor), and with the additional benefit of enabling banks to stand behind their customers' transactions when they are forbidden to issue straight guarantees. See generally Cassondra E. Joseph, *Letters of Credit: The Developing Concepts and Financing Functions*, 94 Banking L.J. 816 (1977). In any of these cases, the issuer specifies conditions under which payment will be made. The Uniform Commercial Code defines "credit" by reference to these conditions. The definition has two stages. Section 5–102, Ill.Rev.Stat. ch. 26 ¶ 5–102, establishes the scope of Article 5 (governing letters of credit), and § 5–103(1) defines "credit":

5–102. Scope. (1) This Article applies
(a) to a credit issued by a bank if the credit requires a documentary draft or a documentary demand for payment; and
(b) to a credit issued by a person other than a bank if the credit requires that the draft or demand for payment be accompanied by a document of title; and
(c) to a credit issued by a bank or other person if the credit is not within subparagraphs (a) or (b) but conspicuously states that it is a letter of credit or is conspicuously so entitled.

5–103. Definitions. (1) In this Article unless the context otherwise requires
(a) "Credit" or "letter of credit" means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this Article (Section 5–102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor.

Transparent relies on § 5–102(1)(c), observing that the document conspicuously calls itself a "letter of credit". (A statement is "conspicuous" if it is "so written that a reasonable person against whom it is to operate ought to have noticed it." UCC § 1–201(10). Paysaver, which wrote this short letter, had to notice its own words.) But § 5–102(1)(c) applies only to "a credit", and under § 5–103(1)(a) a "credit" is an "engagement" to "honor drafts or other demands for payment upon compliance with the conditions" stated. The document Paysaver signed does not engage to do anything, under any conditions.

Sections 5–102 and 5–103, taken together with §§ 5–104 and 5–105 (saying that there are no formal requirements), show that a letter of credit need not be supported by consideration or contain any magic words or expiration date. They show with equal force that a letter of credit is an "engagement" to pay on the occurrence of specified events or the presentation of specified documents. A document engaging to do nothing and mentioning no events is simply a stray piece of paper. *Johnston v. State Bank*, 195 N.W.2d 126 (Iowa 1972); James J. White & Robert S. Summers, *Uniform Commercial Code* 715–23 (2d ed. 1980); 5A *Uniform Commercial Code Case Digest* ¶¶ 5102.3, 5103.3, 5104 (1983 & Supp.1988). Cf. *Wichita Eagle & Beacon Publishing Co. v. Pacific National Bank*, 493 F.2d 1285 (9th Cir.1974) (a document labeled a "letter of credit" is a "guarantee" if its terms are the elements of guarantees and not letters of credit).

The title controls only when the document contain the terms appropriate to the substance of such an instrument. The letter Paysaver signed is no different in principle from a pumpkin on which "$50,000" and "letter of credit" had been stencilled. Just as calling a sports car a "principal residence" will not permit the owner to take the deduction for interest under the tax laws, so calling a pumpkin a "letter of credit" will not make it one. This harmonizes our views with *Board of Inland Revenue v. Haddock*, in which String, J., concluded that a cow bearing the words "To the London and Literary Bank, Ltd.: Pay

to the Collector of Taxes, who is no gentleman, or Order, the sum of fifty-seven pounds (and may he rot!). £57/0/0", was a negotiable instrument.[2] The judge observed that the writing included all the terms necessary for negotiability, and that the cow could be endorsed over to any willing holder.

Insistence on having terms—a concrete "engagement"—is not mere pedantry. Letters of credit give assurance of payment; to promote the reliability of the device, courts do not look beneath the surface of the documents to discover side agreements, plumb the intent of the parties, and the like. Yet only such a detour could flesh out the document written by Paysaver. If this letter were viewed as an ordinary contract, it would be unenforceable on the ground that the undertaking is hopelessly indefinite. A document too vague to be enforced as a contract is an implausible candidate for an Article 5 letter of credit.

Consider what is missing. One item is the term most important to any letter of credit: specification of the circumstances requiring the issuer to pay. Transparent believes that the document commits Paysaver to make good Titan's existing debt. Yet letters of credit to guarantee payment of prior debts are rare. One could see the document alternatively as an undertaking to make good on any new transaction, such as the $61,000 sale under discussion. A letter with this meaning would not stand behind the $33,000 accrued debt. Only speculation or a detailed inquiry into oral negotiations—both anathema in letter of credit transactions—could supply the missing term. Contrast *Bank of North Carolina, N.A. v. Rock Island Bank*, 570 F.2d 202 (7th Cir.1978) (holding an undertaking to be a letter of credit because it contained detailed terms on which payment would occur).

Another missing or confusing item is the customer. The document is captioned "RE: Thomas Wells". Wells was an employee of Titan and not indebted to Transparent.

Counsel for Transparent conceded at oral argument that it had no claim against Wells personally. Only the recitation that the document was issued "at the request of" Titan in addition to that of Wells offers support for application to Titan's transactions. If we must choose between reading the document as standing behind Wells or standing behind Titan, where the former is what the caption says and the latter is a felony (given limitations on credit unions' activities, 12 U.S.C. § 1757), the choice is simple. Transparent balked (as well it should) when asked whether a document saying something like "at the request of Exxon Corp., we undertake to assume the obligations of Titan Tool" would allow Transparent to invoke the letter of credit to collect a debt due from Exxon. Transparent suggested that we dip beneath the surface of *this* document to see that the negotiations leading to its issuance grew out of commercial dealings between Transparent and Titan, but we have explained already why courts do not consider parol evidence when evaluating letters of credit.

The document is silent or obscure on every significant question. Such writings do not promote certainty in commercial transactions. Why a credit union put the words "letter of credit" to a document is beyond us; perhaps the National Credit Union Administration ought to have a few words with the management at the Paysaver Credit Union. Whatever this document may be, it is not a "credit" under §§ 5–102 and 5–103 of the UCC.

AFFIRMED.

---

**2.** This enlightening case does not appear in the official reports, perhaps because it is the invention of A.P. Herbert, *Uncommon Law* 201–06 (1935), but given what *does* appear in the official reports, *Board of Inland Revenue v. Haddock* has its attractions.